James Q. **RAINEY** and Edwin E. Wampler, Plaintiffs-Appellants,

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant-Appellee.**

**TECA No. 9–77.**

Temporary Emergency Court of Appeals.

Argued Dec. 6, 1983.

Decided April 5, 1984.

**1564**

Edward G. Modell, with Ronald L. Plesser, of Blum & Nash, Washington, D.C., and Morton R. Galane, with James J. Jimmerson and Thomas W. Davis, II, of Galane & Jimmerson, Las Vegas, Nev., for plaintiffs-appellants.

G. Stewart Stone, Jr., of Steinhart & Falconer, San Francisco, Cal., with Steven Glade, of Gifford & Vernon, Las Vegas, Nev., for defendant-appellee.

Before CHRISTENSEN, JAMESON and McNICHOLS, Judges.

CHRISTENSEN, Judge.

The controlling issue on this appeal is whether plaintiffs-appellants, doing business as Casino Car Wash (Casino), a branded independent marketer of gasoline, substantially complied with a regulation governing designation of a new base period gasoline supplier. Construing the regulation narrowly upon trial of this case before a jury, the district court held that certain information required to be furnished to the designee Union Oil Company (Union) was fatally lacking. Consequently the court withdrew the case from the jury at the close of the evidence and directed a verdict against the plaintiff both as to claimed damages for circumvention of the allocation regulation and intertwined claims. We reverse.

All of plaintiffs' claims were related to, and depended upon, application of the Emergency Petroleum Allocation Act (EPAA) and its regulations and hence we reject the contention of Union that this court lacks jurisdiction. Having determined that jurisdiction is present, we deny Union's motion to dismiss [1] and proceed to the merits of the appeal.

Rainey and Wampler operated Casino, a combined retailed motor gasoline and car wash facility in Las Vegas, Nevada, between August 1978 and August 1979 as a branded independent marketer of Union's gasoline. Theretofore the site had been supplied by Phillips Petroleum Company and Mobil Oil Company. Union is a major integrated oil company and was Casino's sole supplier during the time Rainey and Wampler operated it.

In the first claim of their amended complaint Rainey and Wampler alleged that Union had circumvented its gasoline supply obligation to Casino in violation of section 205.202 of the Mandatory Petroleum Allo-

---

**1.** Prior to briefing on the merits, Union filed a motion to dismiss this appeal in its entirety on the theory that plaintiffs by reason of the attempted sale of their business had no standing to raise EPAA issues and that only state claims were involved. We denied this motion *pro forma*, subject to further oral argument at the time set for hearing on the merits of the appeal. It now has become doubly clear that the motion to dismiss is without merit for reasons manifest in our discussion of other points. Suffice it to note here that plaintiffs' first claim alleging damages from Union's circumvention of EPAA regulations was deemed by the trial court to have failed because plaintiffs did not activate those regulations by proper designation of Union as their new supplier and, not having been so designated, Union had no obligation to either plaintiffs or plaintiffs' successors. Based on this theory the trial court also dismissed plaintiffs' claims for tortious interference with the sale of plaintiffs' business and breach of contract to supply gasoline because of assumed absence of any obligation on the part of Union beyond the faulted designation to support them.

The drawing of fine lines, as Union would have us do, between the "arising under" and the "issue" formulation of our appellate jurisdiction is unnecessary in this case by reason of the interdependency of the respective claims. *Mobil Oil Corp. v. DOE,* 728 F.2d 1477 at 1497 (Em.App., 1983); *Francis Oil & Gas, Inc. v. Exxon Corp.,* 687 F.2d 484 (Em.App.), *cert. denied,* 459 U.S. 1010, 103 S.Ct. 365, 74 L.Ed.2d 400 (1982); *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp.,* 591 F.2d 711 (Em.App.), *cert. denied,* 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 108 (1979); *Newman Oil Co. v. Atlantic Richfield Co.,* 597 F.2d 275 (Em.App.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 84, 62 L.Ed.2d 55 (1979); *Oltmann v. Mobil Oil Co.,* 673 F.2d 187 (7th Cir.1982); *Mobil Oil Corp. v. Tully,* 639 F.2d 912 (2d Cir.), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). *See, McWhirter Distributing Co., Inc. v. Texaco, Inc.,* 668 F.2d 511, 526 n. 23 (Em.App.1981). *Cf., Texaco, Inc. v. DOE,* 616 F.2d 1193 (Em.App.1979); *United States v. Uni Oil, Inc.,* 646 F.2d 946 (5th Cir.1981).

cation Regulations.[2] It was further asserted that Union in May of 1979 notified a purchaser who had contracted to buy plaintiffs' interest in Casino that Union would not supply gasoline if the purchase were consummated, thereby disrupting the sale and eventually forcing the closing of the outlet. In a second claim plaintiffs alleged that Union's conduct constituted tortious interference with plaintiffs' prospective business advantage. The third claim charged Union with a breach of an implied covenant of good faith and fair dealing by the renunciation of its base supply obligation at the site in light of its 1978 supply contract to cooperate with Casino in securing an allocation.

The case of course involves the concept of supply-purchaser relationships central to allocation regulations. *See,* 10 C.F.R. § 211.9 (1979); *Zahir v. Shell Oil Co.,* 718 F.2d 1567 (Em.App.1983); *Rossi v. Mobil Oil Corp.,* 710 F.2d 821 (Em.App.1983); *Shell Oil Co. v. Nelson Oil Co., Inc.,* 627 F.2d 228 (Em.App.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980). *Cf., Johnson Oil Co., Inc. v. DOE,* 690 F.2d 191 (Em.App.1982); *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). To temper the policy of preserving relationships with suitable flexibility, provision was made by the administrating agency for transfer of obligations to accommodate market developments. The gist of the complaint in this case and the point on which the trial court primarily based its decision involved the following regulation covering change of a base period supplier not through agreement and approval of the agency but simply by the operator's giving of prescribed notices:

(d) *Branded resellers.* (1) Any wholesale purchaser-reseller of motor gasoline which is a branded independent marketer and which has a base period supplier different from the firm that was its supplier on February 28, 1979 under whose brand it was selling on that date may, at its option designate as its base supplier that supplier which was its supplier on February 28, 1979 and terminate its supplier/purchaser/relationship with all its other base period suppliers. If a designation is so made, the firm that supplied the purchaser on February 28, 1979 will become the purchaser's sole base period supplier and will supply the purchaser's base period volumes as part of its supply obligations.

(2) A wholesale purchaser-reseller which designates a firm as its sole base period supplier, pursuant to this section shall provide, by June 15, 1979, written notice of the designation and the corresponding terminations to any suppliers which supplied the wholesale purchaser-reseller during the base period. Such wholesale purchaser-reseller shall also provide written notice by the same date to the designated supplier of the amount of the wholesale purchaser reseller's base period use which had been supplied by other suppliers during the base period and which is to be supplied by the designated supplier. The notice to the designated supplier shall include the names and addresses of the actual suppliers during the base period and of any wholesale purchaser-reseller and the location of any facility, including any retail sales outlet concerned.

10 C.F.R. § 211.105(d)(1), (2), effective May 1, 1979.

It should also be noted that, pursuant to 10 C.F.R. § 211.106(e), whenever a wholesale purchaser-reseller (such as Casino) was deemed to have gone out of business

---

**2.** These regulations, since expired, as they appeared in 10 C.F.R. § 205.202 (1979), provided in part during all material times:

Any practice that circumvents or contravenes or results in a circumvention or contravention of the requirements of any provision of this chapter [II of 10 C.F.R.] or any order issued pursuant thereto is in violation of the FEA regulations stated in this chapter.

41 *Fed.Reg.* 36646 (August 22, 1976). *Cf.,* 10 C.F.R. § 210.61–62; *McWhirter Distributing Co., Inc. v. Texaco, Inc., supra,* at 525–26 n. 23.

in accordance with other provisions of the section "the right to an allocation shall be deemed to have been transferred to its successor on the site, provided such successor established the same ongoing business on the site within a reasonable period of time, as determined by FEO, after its predecessor vacates the premises."

■ There is substantial evidence in the record supporting the following facts favorable to plaintiff's contentions, among others: [3]

In August 1978, Rainey and Wampler for substantial consideration entered into a series of agreements to acquire the right to lease and operate the premises of Casino. They also leased from others new washing equipment. This facility could not successfully operate without an assured source of gasoline for retail sales in connection with the car wash business. The following month Rainey and Wampler entered into a series of agreements with Union by which Union agreed to supply Casino substantial quantities of gasoline annually from Union's declared surplus.

Additionally, Union agreed that it would recommend to the regulatory agency that it be assigned to supply Casino's base period volume requirements for the duration of the Mandatory Petroleum Regulation program,[4] since at that time the obligation

could be transferred from the old to a new supplier only upon agreement of both and approval by the agency. Effective March 1, 1979, the DOE adopted Activation Order No. 1 to the Standby Allocation and Price Rules, 44 *Fed.Reg.* 11202 (Feb. 28, 1979). This order in relevant part changed the base period for motor gasoline from the calendar year 1972 to July 1977 through June 1978. While Phillips Petroleum Company was the supplier during the prior period, Mobil Oil Corporation supplied Casino during the new period and hence effective March 1, 1979, became its base period supplier by operation of the Activation Order.

At the time they acquired Casino, Rainey and Wampler had no experience with and little knowledge of the gasoline business. They depended importantly upon representatives of Union for advice. During April 1979 James Foster, area manager of Union at Las Vegas, Nevada, informed the plaintiffs that the DOE allocation regulations had been amended to make Mobil rather than Phillips the Base Period Supplier for Casino. In the latter part of the same month Wampler contacted Mobil's San Diego office and received from it the base period volumes which had been supplied to Casino.

On May 1, 1979, based on this information Wampler delivered to Foster at Un-

---

**3.** For the purpose of Union's Rule 50 motion the trial court was required to "view the evidence most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence." Wright & Miller, *Federal Practice and Procedure,* Civil § 2524 at 544–45. Such a motion may be granted only when the facts and inferences point so strongly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. *Maxey v. Freightliner Corp.,* 665 F.2d 1367 (5th Cir.1982); *Moore v. Credit Information Corp. of America,* 673 F.2d 208 (8th Cir.1982). The credibility of witnesses may not be weighed on such motion. *Schwimley v. Chrysler Motors Corp.,* 481 F.2d 1025 (9th Cir. 1973). And the court is not to substitute its judgment on issues of fact for that of the jury. *Yazzie v. Sullivent,* 561 F.2d 183 (10th Cir.1977).

**4.** A letter to Rainey and Wampler which formed part of the supply contract contained the following statement:

Your application indicates that Phillips [Mobil is scratched out] is your current obligated supplier. Before the Federal Energy Administration will approve Union's assuming this responsibility, you must secure a letter from Phillips [Mobil is scratched out] releasing them of their base period supply obligation. We will, therefore, hold the FEA Form 17 pending your securing proper release which you hereby acknowledge has been requested. Upon receipt of this release, Union Oil Company will forward to the Federal Energy Administration and recommend Union be assigned to supply your base period volume requirements for the duration of the Mandatory Petroleum Regulations.

ion's Las Vegas office a handwritten document identifying Mobil as the base period supplier of Casino and specifying the base period volumes supplied by Mobil. An employee of Union later typed this information on a Form FEO-17 which Wampler had signed in blank during his visit at Union's office on May 1. At that time Rainey, Wampler and Union believed that this form was necessary to effect a change of the base period supplier from Mobil to Union by agreement of the three entities concerned and approval of the DOE.

On May 5, 1979, Rainey spoke by telephone with George Peabody of the DOE's Office of Hearings and Appeals in Chicago, Illinois, and was informed that under section 211.105(d) of the DOE's regulations, as amended effective May 1, 1979, the consensual form FEO-17 was unnecessary and that Casino could designate Union in lieu of Mobil as its base period supplier by sending notices to that effect to Mobil and Union.

Acting on this information Rainey on the same day wrote and mailed separate letters to Mobil's San Diego office and to Foster at Union's Las Vegas office with the intention of effecting a change of Casino's base period supplier from Mobil to Union. No claim has been made that the letter to Mobil was inadequate under the regulations. The letter to Foster is the critical one, and after its caption reads:

> As of this date, I spoke with Mr. Peabody, Chicago Dept. of Energy. He informed me of the new Federal Regulation 211.105 effective May 1, 1979. This regulation in effect states that if our supplier of gasoline on Feb. 28, 1979 is different from our base period supplier, we can designate the supplier serving us on Feb. 28, 1979, to become our base period supplier.
>
> Union Oil Company of California was our supplier of gasoline on Feb. 28, 1979, and by way of this letter we request that Union Oil of California continue to supply this location and become our base period supplier per Federal Regulation 211.105.

On the day the letters were mailed Rainey and Wampler received and accepted a written offer from American Management Institute (AMI) through John Barrone to purchase for $395,000 their business and leasehold interests in Casino and to assume their obligation to purchase new car wash equipment. On or about May 10, 1979, following inquiry by Barrone, Foster notified him that Union's management in San Diego had decided that Union would not supply AMI with gasoline if the latter purchased Casino. Because of Union's renunciation of any obligation to supply a new purchaser at the site AMI declined to consummate its purchase contract.

There is also evidence in the record from which the jury reasonably could have inferred that at the time of Union's refusal to recognize successor allocation rights of the new purchaser, Union planned to open a new station in the vicinity of the Casino Car Wash and desired to eliminate any competing supply obligation at the Casino site.

Having denied a similar motion at the close of plaintiffs' case, the trial court after all evidence was in granted Union's motion for a directed verdict on the ground that the letter to Union dated May 5, 1979, did not contain all of the information required by section 211.105(d) and that there was missing particularly the amount of gasoline Mobil had supplied Casino during the base period and the name of Mobil as base supplier. The court found for the purposes of the motion that the record established the letter had been mailed by Rainey and received by Foster on behalf of Union, despite Union's contentions to the contrary. It also recognized that had the notice complied with the regulation its receipt in due course would have shifted by operation of law the base period supply obligation from Mobil to Union in favor of Casino and any successor in interest at the site. Concerning information that should have been in the notice to Union but which already had been supplied, the court stated that "I

think you could say, perhaps, it could be inferred that Union did have these figures on hand, at least some of them, because they were in the FEO 17."

Reasoning that supplier consent was required under the prior system, the court referred to the subsection 105(d) procedure as a "summary proceeding" which "had to be strictly construed since it shifts legal relationships automatically." The FEO form information was rejected as supplying the data missing in the May 5 notice because "you can't take a document that is submitted to Union for an entirely [different] purpose, even before Mr. Rainey and Wampler knew of 105(d) and say it meets the requirements of 105(d)."

The trial court thus determined that Union had not become the base period supplier until a third-party agreement was later consummated effective in August 1979, following the new purchaser's abandonment of its contract of purchase. Accordingly, it found it unnecessary to consider plaintiffs' second and third claims in relation to any right to an allocation under subsection 105(d): "All right, apart from the allocation which we have disposed of, what was the relationship between Union and the plaintiffs? The only relationship that existed was the supply contract...." The court failed to attach significance to the undertaking of Union as a part of the supply contract to recommend that Union be assigned to supply Casino's base period volume requirements "for the duration of the Mandatory Petroleum Regulations." It re-

jected plaintiff's position that Union's renunciation of base period supply obligations contrary to EPAA regulations as alleged in their first claim furnished the foundation for their other claims.

It thus is clear that the second and third claims were rejected at least in important part by reason of the failure of the first claim. It is not as clear whether the district court found some separate lack of causation when it said:

> As I think correctly point[ed] out in argument by [Union], there is no causation here. Mr. Foster's alleged statement that he wouldn't supply gas to the site, could not have caused a breach of the contract between Barrone [AMI] and the plaintiffs, because there is no link between Foster's words and the plaintiffs and Barrone's failure to go through with the sale.

In our consideration of the other claims we shall assume, however, that the trial court intended to base its dismissal also upon a theory of absence of causation apart from its conclusion that plaintiffs had failed to comply with the allocation regulation.

We see nothing in the regulatory history of the provisions in question which supports the stringent construction accorded it by the trial court. On the contrary, that history strongly commends a reading based on substance and reason and not on mere form. In addition to facilitating administration, a primary purpose of the 1979 provision was to protect resellers from financial difficulties, not suppliers.[5]

---

**5.** A forerunner of section 211.105(d) was issued by the agency in 1975 when the calendar year 1972 became the base period for allocations, and the agency had in mind the hardship to resellers resulting from multiple suppliers of the same station. It amended subpart F of the allocation regulations to permit branded independent marketers with two or more base period suppliers to designate by notice one of them and to terminate relationships with the remaining ones. The requirements of the notice were comparable to those later provided in section 211.105(d). *See,* 44 *Fed.Reg.* 47477, 47478 (Oct. 9, 1975).

In consideration of the 1975 rule, several persons had urged that the designation of a new supplier not be made effective without the consent of the designated supplier or without FEA approval. The agency responded to these suggestions: "FEA believes that subpart D-Exceptions, of Part 205, Administrative Procedures and Sanctions Regulations, affords an adequate remedy for those suppliers who believe designations made pursuant to the amendment will result in serious hardship or gross inequity." 40 *Fed.Reg.* 47477, 47478 (October 9, 1975). From October 1975 to March 1979, no similar designation rule was needed since no update in base periods was made. Shortly after the DOE

■ Agency interpretations militate against the trial court's grudging view.[6]

In Interpretation 79–25, The Lido Company of New England, ERA Enforcement Manual (CCH) ¶ 56,479 (November 30, 1979), DOE's Office of General Counsel rejected a supplier's argument that section 211.105(d) only applied to resellers that had changed brands between the base period and February 28, 1979:

> Amoco's argument ignores the language of § 211.105(d) which does not require that a purchaser must have changed brands between the base period and February 28, 1979, in order to designate the supplier on the date under whose brand the purchaser was selling motor gasoline as its sole supplier. In addition, *Amoco is unable to cite any support in its regulatory history for its contention that § 211.105(d) must be read as narrowly as it suggests.*

*Id.* at 56,734 (emphasis added).

In Gilbert's Service Station, 8 DOE ¶ 81,014 (1981), the OHA again in effect rejected a narrow construction of subdivision 105(d) in the following language:

> The record reveals that on November 13, 1978, and on March 28, 1979, *Gilbert's obtained letters from Empire Oil that indicated Empire Oil's willingness to become Gilbert's sole supplier.* On November 15, 1978, Gilbert's filed a submission with the DOE Office of Petroleum Operations that listed only Empire Oil as a supplier. After February 1978, Empire Oil was, in fact, Gilbert's Service Station's sole supplier. *Finally, on October 2, 1978, Gilbert's and Penn Fern entered into a mutual termination agreement, which, however, was apparently never formally submitted to the DOE for approval. See* 10 C.F.R. § 211.9(a)(2)(i). Moreover, in view of these circumstances, we are very hesitant to alter the Proposed Decision at a time when gasoline is no longer subject to allocation rules and in a case in which no specific remedy is advocated. *Therefore, we have concluded that Gilbert's course of conduct should be treated as a designation of Empire Oil as the firm's sole base-period supplier pursuant to 10 C.F.R. § 211.105(d). Although Gilbert's actions did not comply in every respect with the technical requirements of that section, we believe that our view of Gilbert's actions is fair and reasonable under the factual circumstances described above.*

*Id.* at 82,550 (emphasis added).[7] Union has cited other administrative rulings claimed

---

changed the base period in February 1979 to the period July 1, 1977 to June 30, 1978, in response to shortages in foreign oil supplies, a designation provision similar to that of 1975 was included in a set of guidelines announced March 19, 1979, in connection with the base period change. Under the new provision DOE approval was required for finalization of a designation. However, once application for approval was made the new designee could temporarily supply the reseller pending final agency approval if willing to do so. The temporary supply obligation was *effectuated through notice requirements* contained in Guideline 8. *See,* 44 *Fed. Reg.* 16483–84 (March 19, 1979). On May 1, 1979, the DOE issued its Interim Final Rule which changed the existing base period to November 1977-October 1978. 44 *Fed.Reg.* 26712 (May 4, 1979). Section 211.105(d) as amended incorporated Guideline 8 as part of the Interim Final Rule but without the requirement of final DOE approval. It was observed that the DOE had received more than 7,000 requests for relief and had concluded that the adoption of an automatic adjustment provision was necessary to provide relief for May 1979 and for subsequent months and that unless this were done many marketers would be unable to obtain adequate supplies of gasoline and would experience financial hardship.

**6.** Interpretation of a regulation by the agency in charge of its administration is entitled to great deference and will be upheld unless clearly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Union Oil Co. of California v. DOE,* 688 F.2d 797, 807 (Em.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

**7.** Union argues that *Gilbert's Service Station* involved exception relief rather than a question of regulatory compliance; that the request for exception relief presupposed noncompliance with the regulation governing the change of suppli-

to be favorable to its position [8] but we find them to be distinguishable and unpersuasive.

■ Other arguments of Union are disposed of by the face of the regulation itself. Its language sets out the two components of the notice in separate sentences; the use of the word "also" implies that the required information may be supplied separately. The regulation states that the gallonage figures must be provided "by the same date" as the deadline for the notice of designation, June 15, 1979, also suggesting that the required information could be furnished in different communications. Union argues that large companies might not be able to correlate separate notices because of their massive files and accounts. Especially in this case, where the same individual, Foster, received on behalf of Union all the crucial papers and was directly involved in initiating and facilitating an assumption by Union of Mobil's obligation, we are not impressed.

Union also maintains that even though it already may have possessed the assertedly missing information, the FEO–17 form containing it was provided by Casino with an intent foreign to the purposes of section 211.105(d), a view which the trial court seemed to accept as critically persuasive. But the intent of Rainey and Wampler at the time the May 5th notice was sent, not their intent when the FEO–17 form was prepared, was the decisive one. At the time the May 5, 1979, notice was given to Union, Rainey and Wampler knew, as did Union, that the latter had the FEO–17 in-

formation for the purpose of becoming their base period supplier. The agency in a related context had recognized that a notice previously given for a purpose other than to fulfill the requirements of subsection 105(d) could be effective also for that purpose when it said with reference to the 1975 notice provisions in Guideline 8: "Since this provision was contained in the guidelines in substantially the same form, in most cases the notices will already have been provided." 44 *Fed.Reg.* at 26719 (Preamble to Interim Final Rule).

Union argues the FEO–17 was inadequate because it failed to designate Casino's base supplier, and misstated the base period gallonage. The FEO–17 did in fact designate Casino's base period supplier, it appearing from its first page that Mobil supplied the station from September 1977 to July 1978.[9] The misstatement of gallonage referred to by Union involved the substitution of the November and December 1978 gallonage for that of the corresponding months of 1977. Regulatory history and interpretations of the agency refute the necessity of letter-perfect compliance. By the regulations themselves discrepancies were subject to resolution upon application of interested parties; a reasonable approach was charted:

> If a supplier and purchaser disagree over the volumes required to be supplied as a base period volume or as an adjusted base period volume, application for resolution of the dispute should be made to the appropriate DOE enforcement division. DOE may require the production

ers. Such an argument ignores the substance of the decision and the contentions of the supplier. No exception to the operation of 105(d) was involved. OHA noted that ARCO "does not contest the tentative grant of exception relief in and of itself, ARCO does object to the selection of Empire Oil as the supplier of Gilbert's increased base period volumes." 8 DOE at 82,549.

8. Fasgo, Inc., 5 DOE ¶ 81,169 (February 26, 1980) Energy Mgmt. (CCH) (1980 Transfer Binder, Vol. 1); F & P Market, 6 DOE ¶ 81,162 (July 21, 1980), Energy Mgmt. (CCH) (1980 Transfer Binder, Vol. II).

9. Though not pressed by Union, the point may be mentioned that the FEO–17 does omit Mobil's address. Here is another illustration of the salutary principle that substance and reason, not mere form, is of primary importance. Since Mobil was a generally known entity, its address was less crucial than it might have been otherwise. Foster himself informed Casino that Mobil had succeeded Phillips in becoming its base supplier; it is inconceivable that Union did not already have its address.

of any relevant information necessary to resolve the dispute. If a supplier's position is determined to be incorrect, it will be obligated to make up any volumes it should have supplied but did not. Section 211.103(f) 44 *Fed.Reg.* at 26721. Union could have suffered no prejudice from the discrepancy. Had the discrepancy not been discovered its supply obligation would have been treated as less than it really was since the figure furnished in the form did not reflect its full extent. Had the error been discovered, the regulation itself provided means for correction.

Union further contends that AMI, as the prospective purchaser, planned to sell gas to realtors only and thus could not qualify as a successor to Casino for the purposes of a base period allocation. It is correctly pointed out that substantial alteration of the basic commercial practices of a predecessor would not satisfy the requirement that the same ongoing business be carried on to preserve the site right pursuant to section 211.106(e). *See, e.g.,* Interpretation 75–57, Body Beautiful Carwash, 6 Energy Mgmt. (CCH) ¶ 56,325 (April 7, 1975) (Body Beautiful); DOE ruling 1980–2, 2 Energy Mgmt. (CCH) ¶ 16,076 at 16,769. It does not follow, however, that AMI could be deemed disqualified as a matter of law. There were related fact issues for the jury if, indeed, the record below would support any inference that AMI intended to so depart from the practices of the former business as to disqualify itself as a successor to that business. Any plan involving realtors was described by Barrone only as a "thought." He also testified that AMI was interested in a supply of gas generally. It was recognized in *Body Beautiful, supra:* "... 211.106(e) generally presumes that a succeeding retail sales outlet business is capable of serving substantially the same group of motorists in the community which was served by the predecessor." 6 CCH Energy Mgmt. at 56,398.

Union argues that since the purchase agreement between Casino and AMI did not mention gasoline, Union's refusal to sell to AMI furnished no reason for the latter to abort the sales contract. There is, however, sufficient evidence in the record to show that a significant part of the consideration for the transaction was the station's gasoline business. Barrone testified the deal was terminated because of Union's refusal to supply gasoline. The jury could have found a causal connection between Union's refusal and the abandonment of the contract. What we said in *Zahir v. Shell Oil Company, supra,* is applicable in principal here:

> Shell argues that even if Zahir had a right to be supplied by Shell, he lost that right when he went out of business sometime in July, 1979.... But if Zahir stopped operating the station in July only because he was unable to obtain gasoline from Shell, he did not lose his right to that gasoline by "going out of business" within the meaning of these regulations. To hold otherwise would enable Shell to turn its breach of its duty into a lawful act by reason of its almost inevitable effect. A gasoline station cannot operate successfully without gasoline. And in a time of shortage a station operator who is cut off by his supplier, has little chance, if any, to obtain gasoline elsewhere.

The sufficiency of the evidence to indicate compliance with subsection 105(d) also leads to the conclusion that the related claims of Casino also should have been left to the jury. The first claim was central to the theory on which the other claims were based. Having found non-compliance with subsection 105(d) as a matter of law, the district court destroyed the proper basis for evaluating all of the claims.

■ Union contends that a claim for interference with prospective business advantage cannot be based on a contract fraudulently obtained and that Rainey and Wampler procured the purchase contract from AMI through the misrepresentation or omission of various fact statements in the

**1572**

course of negotiations. The trial court made no determination that this was so. Assuming without deciding that Union was in a position to raise the point and that there was more than a scintilla of evidence to support it, the jury at least should have been permitted to find under proper instructions what the facts were. Union further argues that there was a failure on the part of plaintiffs to establish a prima facie case of interference because of lack of evidence that Union knew or intended that its refusal would cause a breach of the agreement. Dubious on its face, at best this contention would have presented an issue for the jury on the present record.

Other contentions made by Union in its exceedingly multifarious effort to support the trial court's decision have been considered and found to be without merit.

The district court erred by granting Union's motion for a directed verdict. On the present record the case should have been submitted to the jury. In so deciding, we express no opinion as to the ultimate merits of the case.

Reversed and remanded for further proceedings in harmony with this opinion.