UNION OIL COMPANY OF CALIFOR-
NIA, Defendant-Appellant,

v.

James Q. RAINEY and Edwin E.
Wampler, Plaintiffs-Appellees.

No. 9–91.

Temporary Emergency Court of Appeals.

Argued Aug. 15, 1985.

Decided Sept. 18, 1985.

Steven Glade, Gifford & Vernon, Las Ve-
gas, Nev., with whom Dean P. Vernon, Las
Vegas, Nev., of the same firm, was on
brief, for defendant-appellant.

Morton R. Galane, Las Vegas, Nev., with
whom Thomas J. Tanksley of the same
firm, Las Vegas, Nev., and Edward G. Mo-
dell, Blum, Nash & Railsback, Washington,
D.C., were on brief, for plaintiffs-appellees.

## MEMORANDUM DECISION

Before CHRISTENSEN, JAMESON *
and McNICHOLS, Judges.

CHRISTENSEN, Judge.

This is a second appeal of this action. In
*Rainey v. Union Oil Co. of California,*
732 F.2d 1563 (Em.App.1984), this court
held that direction of the jury verdict
against the plaintiffs was error, and re-
versed and remanded. The regulatory
background and factual situation involved
in the present appeal are sufficiently indi-
cated in our earlier opinion to render un-
necessary their repetition here.[1]

---

\* Judge Jameson filed a concurring opinion, at-
tached hereto.

**1.** Our prior statement has been accepted by the
parties with one qualification. Whereas we re-
cited that Rainey and Wampler had no previous
experience with and little knowledge of the gas-
oline business, 732 F.2d at 1566, Union Oil prop-

erly points out that "between 1951 and 1963
Wampler was successively a service station at-
tendant, a service station manager and owner of
two service stations." We should add that for
more than two years of this period he was
engaged in unrelated army activity, the service
stations he was connected with during varying

James Q. Rainey and Edwin E. Wampler (plaintiffs) claimed that the defendant Union Oil Company (Union) had circumvented its gasoline supply obligation in violation of the Mandatory Petroleum Allocation Regulations under the Emergency Petroleum Allocation Act (EPAA), thus tortiously interfering with their prospective business advantage and breaching a covenant of good faith and fair dealing implied by the supply contract between the parties. The controlling issue on the first appeal was whether plaintiffs, doing business as Casino Car Wash (Casino), a branded independent marketer of gasoline, had substantially complied with a regulation governing designation of Union Oil as their base period gasoline supplier. 732 F.2d at 1563. Construing this regulation narrowly, the district court had held that certain information required to be furnished to the designee Union was fatally lacking, even assuming the essential notice was sent which was denied by Union. Consequently, the district court withdrew the case from the jury at the close of the evidence and directed a verdict against the plaintiffs both as to claimed damages for circumvention of the allocation regulation and the intertwined state claim. We reversed and remanded the case for further proceedings. A new trial was held before a different judge.

The jury in the second trial determined that proper notice had been given to make Union the base period supplier for Casino and that Union improperly renounced its responsibilities at the site when John Barrone, a purchaser of the car wash, sought a gasoline supply, was refused, and as a result rescinded his purchase contract. The jury awarded the plaintiffs $436,000.00 in compensatory damages and $800,000.00 in punitive damages. The judgment on the verdict thereafter was supplemented by the court to include $113,607.64 in prejudgment interest and costs of suit.

Union in the present appeal takes no exception to the determinations of the jury on the point of its base supplier obligation, has no complaint about the instructions of the court to the jury but describes in its opening brief the issues it now relies upon as follows:[2]

1. Whether there is substantial evidence in the record to support the jury's refusal to find that Rainey and Wampler procured the AMI purchase agreement through fraud (by misrepresentation and by non disclosure).

2. Whether the common law of Nevada permits any award of damages for interference with a contract, where the contract was procured by the claimant's fraud.

3. Whether a fraudulent procured contract can be the basis of an award of damages under a claim for circumvention of a gasoline supply obligation in violation of section 205.202 of the Mandatory Petroleum Allocation Regulations (10 C.F.R. § 205.202 [1979]).

4. Whether there is substantial evidence in the record to support the jury's award of $800,000.00 in punitive damages.

periods over the remaining years were located in relatively small communities, and the point we considered significant was that there had been no experience whatsoever by either of the two plaintiffs with federal oil controls, which did not come into existence until a considerable time later.

2. No question of our jurisdiction has been raised on this appeal, we having determined on the first appeal that the primary federal allocation act claim and the state claim were interdependent and that all decided issues "were related to, and depended upon, application of the Emergency Petroleum Allocation Act," 732 F.2d at 1564. This continues to be the law of the case. The question of whether the alleged fraud against a third party should bar relief on an EPAA Act claim itself was a federal policy question. The inseparable basis of the new judgment continues to be the Allocation Act and its regulations. *See Northern Oil Co. v. Standard Oil Co. of Cal.,* 761 F.2d 699, 703–04 (Em.App. 1985). Recently we again exercised jurisdiction under comparable circumstances which involved commingled claims of fraud and release. The controlling authorities have been amply summarized there by Judge Metzner. *Sector Refining, Inc. v. Enterprise Refining Co.,* 771 F.2d 496 (Em.App.1985), is generally in accord, with nothing weighing to the contrary despite some enigmatic dicta on page 10 of the slip opinion.

5. Whether the trial court abused its discretion by refusing to order a new trial, or a new trial conditioned upon a remittitur of punitive damages, in light of the evidence and the amount of the punitive damage award.

Union argues that the common law of Nevada does not permit an award of damages for interference with a contract procured by the claimant's fraud; that even if fraud has not been established, the alleged attempt of Rainey and Wampler to mislead Barrone should be held to have put the Barrone purchase agreement beyond the protection of the tort of interference; and that a fraudulently procured contract cannot be the basis of an award of damages under a claim for circumvention of the Mandatory Petroleum Allocation Regulations nor for an award of damages for breach of covenants of good faith and fair dealing implied in the supply contract.

█ The cases cited by Union to support this position dealing generally with elements of fraud which are not in dispute here or with essentially different states of fact are not persuasive. None involved the defense of a claim against a third party based upon a merely voidable contract by another not seeking to avoid it. None dealt with policy considerations inhering in the EPAA. None dealt with a situation where the act of interference was itself in violation of law apart from the consequence of the interference.

Union also refers to an annotation on the subject of "Liability for Interference with Invalid or Unenforceable Contract," in 96 A.L.R.3d 1294, indicating generally that while interference with a void contract is not actionable, interferers may not be in a position to raise the mere voidability of another's contract as a defense. More to the point here, the cases seem agreed that when interference is based upon the fraud of the interferer itself, it is no defense at all that the contract might otherwise be unenforceable.

Union in the present context should be in no better position to raise the defense of unenforceability than if it had interfered with plaintiffs' contract by means of its own fraud. Its position may be even less tenable in view of the strong federal policy inhering in the mandatory oil allocation regulations during the relevant period; its own violation of those regulations was the very act which constituted the interference.

Appellant's argument fails factually as well. It is necessarily based upon the assumption that fraud on the part of plaintiffs was conclusively established. To the contrary, the fraud issue was presented by the trial court to the jury under instructions concerning which no complaint has been made and the record is ample to sustain the jury verdict rejecting Union's fraud defense on the facts.[3] Notwithstanding extended recitations in appellant's brief and rationalization concerning them, no misstatements of fact are specified, the fragmented and strained claims of material

**3.** Union's unique approach of arguing that unavoidably the purchaser would have been misled because in order not to be he would have to have had explained to him the limited nature of the existing allocation from Union is purely a make-weight argument without substantial support in the record. The purchaser, confronted at the trial with those limitations, indicated that if Union had not rejected its obligations, whatever their limitations were, he would have taken a chance on changes in allocation, and have consummated the purchase. He said with reference to the listing statements submitted by plaintiffs to him and the purchase agreement itself that there was nothing in the documents that misled him. Moreover, with respect to the plaintiffs' conduct and statements in general he testified:

Q (by plaintiff's counsel). And now you've having had an opportunity I'll ask the closing question: Can you think of anything in the conduct or statements of either James Rainey or Edwin Wampler that ever at anytime misled you?

A No, I think they were honest and straight-forward and real legitimate in their dealings with us.

5 Tr. 946–47.

It is ironic that having argued that it was vital for Barrone to have been told about the limitations of Union's supply obligation, it has argued also that its own total rejection of that obligation was not the proximate cause of Barrone's rescission of the purchase contract.

omissions involve selected inferences among variant ones that reasonably could be drawn. Union has broadly assumed the existence, for example, of intent to defraud on the part of plaintiffs and reliance on the part of Barrone, whereas the jury with ample support in the record accepted the testimony of the plaintiffs, the alleged victim, and other evidence in the case to the contrary.

▆ The substantive lack of merit in the appellant's position would seem enough, but there is another defect seriously eroding it in any event. The oil company's claim that plaintiffs' fraud barred its recovery is in essence an attack upon the sufficiency of the evidence negating fraud which the jury accepted, and of course any contention of the insufficiency of the evidence to warrant punitive damages in the amount awarded is in the same category. Union failed to make any motion for a directed verdict at the close of the evidence. This in itself ordinarily would preclude consideration on appeal of the appellant's basic contention of insufficiency of the evidence. We have recently so held. *Sector Refining, Inc. v. Enterprise Refining Co., supra. See also, Bunch v. Walter,* 673 F.2d 127 (5th Cir.1982); *Little v. Bankers Life & Casualty Co.,* 426 F.2d 509 (5th Cir.1970); *Brown v. Poland,* 325 F.2d 984 (10th Cir.1963). In *Urti v. Transport Commercial Corp.,* 479 F.2d 766 (5th Cir. 1973), which appellant claims supports its contention that the issue of lack of evidence may be raised by a motion for new trial, the court emphasized that this is so only where there is an "absolute absence of evidence to support the jury's verdict" and the denial of the motion for new trial would have constituted an abuse of discretion or plain error. *See also, Coker v. Amoco Oil Co.,* 709 F.2d 1433 (11th Cir.1983). This is far from the situation here.

The rule recognized in Nevada as well as elsewhere is that fraud must be established by clear and convincing evidence. *Hindenes v. Whitney by Vogelheim,* 697 P.2d 932, 933–34 (Nev.1985); *Lubbe v. Barba,* 91 Nev. 596, 540 P.2d 115, 117 (Nev.1975). *See generally, Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979). Since there was abundant evidence to warrant the jury's finding against Union on the fraud issue, and the trial court denied Union's motion for new trial in recognition of this, appellant's contention fails under the general rule as to reviewability and also by reason of its lack of merit.

To the extent that there could be any question but that the same rule of nonreviewability requires affirmance of the judgment as to the allowance and amount of punitive damages, the record facts again negate appellant's position. It having been determined by the jury that the oil company falsely denied for its own profit the receipt of the crucial notices and caused substantial actual damages, the requisite malice is hardly subject to question, nor are the propriety and amount of punitive damages the jury assessed in view of the nature of the company's infraction, the amount of actual damages it caused which is unquestioned on this appeal, the relationship of the two awards, and the large profits and assets of the company.[4]

The appellant argues that Rainey's "admission" at one point that Foster, Union's regional representative, was doing his best to keep Casino in business, defeats plaintiffs' claim for punitive damages. The extent of the claimed admission is overdrawn by this argument, but the vital counterpoint is that Foster himself testified that the ultimate decision to deny Barrone a supply of gasoline was made not by himself but by his superiors. The gist of plaintiffs'

---

**4.** A recent case on punitive damages also involved the appellant now before us. In *Sarah M. Spaeth v. Union Oil Co. of California,* 762 F.2d 865 (10th Cir.1985), the Tenth Circuit on a second appeal, having theretofore held that punitive damages of $3,000,000.00 on an award of $22,807.00 actual damages was excessive, sustained punitive damages of $2,000,000.00 notwithstanding the same relatively small amount of actual damages, stating that the defendant's malicious conduct, "together with its net worth of three and a third billion dollars [as of 1980] must be considered, along with the injury inflicted."

contention was not that Foster personally denied their purchaser the gasoline supply to which he was entitled at the site, but that Foster's superiors effectively renounced the company's obligation to Barrone, plaintiffs' buyer, and thus improperly disrupted the sale.

In sum, the evidence before the jury tended to show that through the unjustified intervention of Foster's superiors Union, with a net worth at the end of 1983 of over $5.18 billion and net earnings of $804 million in 1982 and $625.9 million in 1983, not only disaffirmed its legal obligation to supply a prospective purchaser gasoline on which the viability of the subject matter of the sale depended, but did so knowing that the plaintiffs thereby might be thrown into serious financial difficulty, which risk it was willing to inflict for its own business purposes. It denied having received the crucial notice which the jury found it did receive. It accused the plaintiffs in effect of conspiring to fabricate the sending of that notice, and another notice also actually sent and received, to gain economic advantage for itself. The higher officials of the

company who actually made the decision to renounce the corporate supply obligation were not called by Union as witnesses, no reason for this unusual failure was disclosed and no justification for their decision appeared.

We accept and agree with the considered judgment of the able trial judge that the jury's verdict was supported by the evidence when he denied Union's motion for new trial or for remittitur,[5] and we agree with him that it is immaterial under the facts of this case whether the state or federal rule of evidential sufficiency is applied,[6] assuming the relevancy of any possible difference in EPAA context.[7]

We have considered the other contentions and arguments advanced by the appellant and find them to be without merit.

AFFIRMED.

JAMESON, Judge, concurring.

I concur in the conclusions and most of the content of Judge Christensen's well considered opinion.

**5.** The appellant seeks comfort in an indication by the trial judge that he would not have found malice of the type warranting punitive damages had he been the fact finder. He recognized, however, that the jury verdict was controlling, as do we:

> Nevertheless, the Court believes that a reasonable juror could have found such malice, on the basis of the evidence cited by the plaintiffs. That is to say that the clear weight of the evidence was not necessarily against the inference or finding of malice. Thus the Court will not order a new trial simply because the jury awarded punitive damages to the plaintiffs.

(JA 445.)

This view is consistent with a recent expression of the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* —— U.S. ——, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985):

> [A]s the case is presented to us, we must interpret the entire record in the light most favorable to Highlands and give to it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn [citation omitted].
> Moreover, we must assume that the jury followed the court's instructions....

**6.** The trial court commented:

> In response to the plaintiffs' reliance upon the Nevada case law, the defendant maintains that a federal standard should be applied. This argument has some viability only in that one of the plaintiffs' claims of action sounded under federal regulatory law. Should the tort of unlawful interference with prospective business advantage be deemed the legal basis for the jury's verdict, state law is clearly applicable.
> Whether the jury relied upon either cause of action for its verdict, the Court does not believe that the federal courts would typically conclude that the jury's award was excessive, in light of the large amount of compensatory damages also awarded—$436,000. The 1.83 punitive-to-compensatory damage ratio found in the present case is not dissimilar to that awarded by other federal courts [citations omitted].

(JA 446–47.)

**7.** *But see Byrd v. Blue Ridge Electric Cooperative,* 356 U.S. 525, 538–39, 78 S.Ct. 893, 901–02, 2 L.Ed.2d 953 (1958); *John Hancock Mutual Life Ins. Co. v. Dutton,* 585 F.2d 1289 (5th Cir.1978); *Kinder v. Northcutt,* 424 F.2d 222 (10th Cir.1970). *See also, Silkwood v. Kerr McGee Corp.,* 769 F.2d 1451 (10th Cir.1985). *Cf. Kuziw v. Lake Engineering Co.,* 586 F.2d 33 (7th Cir.1978).

With respect to the award of punitive damages, the district court after examining the record, "[did] not believe that the conduct of Union Oil ... was the result of malice of the type which would form a proper basis for punitive damages." I agree with the district court. I also agree, however, with his further conclusion that "a reasonable juror could have found such malice," and that "the clear weight of the evidence was not necessarily against the inference or finding of malice."